## A04A0457. McCRAY v. THE STATE.
### (601 SE2d 452)

SMITH, Chief Judge.

In a jury trial, Wangavu McCray was convicted of trafficking in cocaine and possession of cocaine with intent to distribute. For sentencing purposes, the trial court merged the possession count with the trafficking conviction. After the trial court denied McCray's amended motion for new trial, this appeal followed. McCray contends that the trial court erred in denying his motion to suppress the evidence of cocaine, and he contests the sufficiency of the evidence. Finding no error, we affirm.

In ruling on a motion to suppress, the trial court sits as the trier of fact, and the court's findings are analogous to a jury verdict and will not be disturbed when the record contains any evidence to support those findings. *Temples v. State*, 228 Ga. App. 228, 229 (491 SE2d 444) (1997). When reviewing a trial court's ruling on a motion to suppress, the evidence must be construed most favorably toward the court's findings unless those findings are clearly erroneous. *Ledford v. State*, 220 Ga. App. 272, 273 (469 SE2d 401) (1996). "Further, in reviewing the denial of a motion to suppress, we consider all the evidence of record, including evidence introduced at trial." (Citations and footnote omitted.) *Whitehead v. State*, 258 Ga. App. 271, 273 (1) (574 SE2d 351) (2002).

So considered, the evidence shows that on March 1, 2002, the Charlton County Sheriff's Office operated an impaired driver/safety checkpoint. According to the written policies of the sheriff's office, the "main mission" of such a checkpoint was "highway safety." Before authorizing the location of this particular checkpoint, Sheriff Dobie Conner met with Chief Deputy Marty Crews and Lieutenant Kenneth Jones to review the plan. Crews and Jones provided supervision at the scene. Officers stopped every vehicle. They asked each driver to produce his or her license and proof of insurance, and they checked for expired tags. In addition, officers were expected to check for seatbelt and child restraint violations and impaired drivers. If a driver produced the proper paperwork and no safety violations were apparent, he or she was free to proceed. The average delay was approximately a minute to a minute and a half. When a question arose about the validity of a license, officers would instruct that

driver to pull over to the side of the road while the license was verified through a dispatcher in the sheriff's office.

When McCray drove up to the checkpoint, Deputy Sheriff Milton Drury asked for his driver's license, and McCray produced the tattered remnants of a duplicate Florida license. Part of the license was missing completely, and it was barely readable in places due to scratches and cracks. Although McCray told Drury that he lived in Georgia, Drury noticed that McCray's car had a Tennessee tag. When asked to produce his car's registration, McCray could not do so and said that the car belonged to a friend. To Drury, McCray seemed nervous. Drury asked McCray to pull over to the side of the road so he could check his license through dispatch. Drury testified that it required "probably some three to four minutes," for him to verify McCray's Florida driver's license. By the time Drury walked back from his patrol car to return the license, McCray was in handcuffs.

During Drury's absence, Lieutenant Jones, his supervising officer, had approached McCray. Jones, a 17-year law enforcement veteran, had regular investigative duties but was also partnered with "Sgt. Jack," a multipurpose police dog trained in tracking, apprehension, and narcotics detection. As Jones approached McCray, who was standing at the rear of his car, Jones noticed that McCray seemed nervous and displayed suspicious body language, including nervously moving his feet. To Jones, McCray's behavior "sent up a flag that possibly he may run." Based on his prior experience in dealing with people who had "run on me," Jones decided that "something's fixing to happen." Thinking McCray was considering fleeing, Jones told McCray that he was going to run his K-9 dog around his vehicle. After retrieving Jack from his truck parked across the road, Jones did just that. Jones had Jack begin at the front fender of McCray's car then proceed down the driver's side. As Jack neared the driver's side door, he alerted, indicating the presence of drugs. For McCray's benefit, Jones repeated the process, and the K-9 alerted a second time. After Jack alerted at the same spot a second time, Jones told McCray that his vehicle would be searched. Jones then opened the driver's side door and found a black bag on the floorboard. Jones testified that the bag "was right there at the crease of the door where my dog alerted. . . ." The bag contained what was later determined to be 28.4 grams of 51 percent pure cocaine. McCray was arrested and placed in handcuffs.

This activity took place while Drury was inside his patrol car, located about 40 or 50 yards away, checking McCray's Florida license with dispatch. Drury testified that this license check required at most four minutes. When asked if he would have detained McCray if he had provided an intact license, Drury said that he would not have done so.

Jones testified that his police dog was there, in part, because the dog was assigned to him and "he always goes," and because "I had nowhere else to put him." Jones also testified that the dog was there for officer protection and to be available for tracking or apprehension should someone flee into the nearby wooded area. Approximately 1,000 vehicles were checked that day. When asked "how many cars did you run your dog around that day?" Jones responded, "Probably ten maybe." Sheriff Conner denied that the checkpoint was intended to stop people in order to check for drugs.

In denying the motion to suppress, the trial court found that Drury had valid reasons to check the validity of the Florida license, given its defective condition and McCray's Tennessee tag. Noting that the license "was in the process of still being run at that time the dog alerted," the trial court found that McCray was being detained for a valid reason and that it was during that detention that the dog was walked around the vehicle. The court determined that "a valid stop and a valid search of the vehicle" took place.

1. McCray contends that the trial court erred in denying his motion to suppress because the initial stop of his vehicle was not legal. He argues that although the stated policy seems to pass constitutional muster, the testimony of the witnesses made clear that it was the officers' intention to exceed that policy. He claims that in addition to the stated goals, the purpose was to seek what the sheriff denoted as "whatever other violations we may find." He points out that, in addition to Jack, four other dogs were present. McCray claims that "[w]henever any excuse existed to detain a vehicle, a dog was run over the vehicle." When the primary purpose of a roadblock is general law enforcement, the roadblock violates the Fourth Amendment. *State v. Ayers*, 257 Ga. App. 117, 119 (570 SE2d 603) (2002). A highway checkpoint established for the principal goal of interdicting illegal narcotics is constitutionally impermissible. *City of Indianapolis v. Edmond*, 531 U. S. 32, 47 (121 SC 447, 148 LE2d 333) (2000).

> In examining the propriety of roadblock stops, the issue for resolution is not whether there was probable cause to stop the vehicle, but whether the roadblock stop was otherwise implemented and conducted in a manner as to demonstrate that the stop of the vehicle was "reasonable" under the Fourth Amendment.

*LaFontaine v. State*, 269 Ga. 251, 252 (3) (497 SE2d 367) (1998). The checkpoint at issue was established for the legitimate purpose of examining driver's licenses, insurance, and registration. Supervisory personnel rather than field officers decided the date and location of the checkpoint and all vehicles were stopped. The delay was minimal,

and the checkpoint was clearly identified to approaching traffic by flashing blue lights, posted signs, and marked vehicles. See *Lutz v. State*, 274 Ga. 71, 74 (3) (548 SE2d 323) (2001). The record therefore contains support for the trial court's findings.

While appearing to concede the legality of the checkpoint itself, McCray seeks to challenge the presence and use of drug dogs at the scene. He argues that the "checkpoint was clearly not for the limited purposes set out in the policy." He contends that once officers found a "pretext," they then felt entitled to use a drug dog because "then it's free air." He claims that "Jones had no basis for putting the dog on the car initially."

No evidence shows that McCray was detained for the purpose of bringing a drug dog to the scene to investigate. Compare *State v. Kwiatkowski*, 238 Ga. App. 390, 392-393 (519 SE2d 43) (1999) (detaining individual to await arrival of drug dog was illegal when based on officer's mere hunch). The mere presence of a drug dog used to sniff vehicles suspected of containing illegal narcotics did not invalidate an otherwise lawful roadblock. See *Harwood v. State*, 262 Ga. App. 818, 821 (1) (c) (586 SE2d 722) (2003).

When the police dog alerted on McCray's vehicle, Drury had not yet completed the process of verifying McCray's license. See *Simmons v. State*, 223 Ga. App. 781, 782 (2) (479 SE2d 123) (1996) (when traffic stop ends, unless a driver consents to a search, further detention exceeds scope of permissible investigation). Since McCray was being validly detained, the dog handler was free to walk the dog around the car because the "use of a trained drug detection dog, in a location where he is entitled to be, to sniff the exterior of a container, is not an unreasonable search." (Citation and punctuation omitted.) *Rogers v. State*, 253 Ga. App. 863, 864 (1) (560 SE2d 742) (2002). Had the purpose of the checkpoint been unlawful then the free air search would likewise have been unlawful. See *State v. Burns*, 238 Ga. App. 683, 686 (520 SE2d 39) (1999) (since police lacked reasonable suspicion to justify stop of defendant's vehicle, free air search by drug dog was illegal).

2. McCray contends that the trial court erred in denying his motion to suppress because, even assuming that the initial stop was lawful, the State exceeded its authority by searching his vehicle without permission or a search warrant to do so. We disagree. The drug dog was in a place where he was authorized to be and did not intrude upon the interior of the car. See *Casey v. State*, 246 Ga. App. 786, 790 (3) (a) (542 SE2d 531) (2000). After the dog trained in narcotics detection alerted on the outside of McCray's vehicle, Jones had probable cause to search the interior. Id. See also *State v. Folk*, 238 Ga. App. 206, 209 (521 SE2d 194) (1999). Here, as in *Crenshaw v. State*, 248 Ga. App. 505, 511 (4) (546 SE2d 890) (2001), the car was

searched only after the dog alerted at the door. See *Warren v. State*, 254 Ga. App. 52, 55 (2) (561 SE2d 190) (2002).

3. McCray challenges the sufficiency of evidence on the ground that the seizure of the cocaine was illegal. McCray admits, however, that he "does not seriously contend that the evidence as presented is insufficient to support the verdict." Instead, McCray claims that "the evidence seized from the car (the cocaine) should not have been admitted for the reasons set out under enumerations one and two." Because we have concluded that the cocaine was properly admitted in evidence, this argument is moot.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED JUNE 24, 2004.

*McGee & McGee, James B. McGee III*, for appellant.

*Richard E. Currie, District Attorney, Alexander J. Markowich, Assistant District Attorney*, for appellee.